# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ARMSTRONG ENERGY, INC., *et al.*, | ) | Case No. 17-47541-659 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |
|  | ) | Related Docket Nos. 7, 87 |

**FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363
AND 507 AND BANKRUPTCY RULES 2002, 4001 AND 9014
(I) AUTHORIZING DEBTORS' USE OF CASH COLLATERAL,
(II) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED
PARTIES AND (III) MODIFYING THE AUTOMATIC STAY**

Upon the motion (the "Motion"), dated November 1, 2017, of the above-referenced debtors, as debtors in possession (collectively, the "Debtors") in the above-captioned cases (collectively, the "Cases"), seeking entry of an interim order and a final order pursuant to sections 105, 361, 362, 363 and 507 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), providing for, among other things:

(a)     authorization for the Debtors, pursuant to Bankruptcy Code sections 105, 361, 362, 363 and 507 to (i) use cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code ("Cash Collateral"), and all other Prepetition Collateral (as defined herein), solely in accordance with the terms of the Interim Order (as defined below) and this order (this "Final Order," and together with the Interim Order, the "Cash Collateral Orders"), and (ii) provide adequate protection to the Secured Noteholders and other Prepetition Secured Parties (each as defined below) on the terms set forth herein;

(b)     authorization to grant adequate protection liens on the proceeds and property recovered in respect of the Debtors' claims and causes of action (but not on the actual claims and causes of action) arising under Bankruptcy Code sections 544, 545, 547, 548 and 550 or any other similar state or federal law (collectively, the "Avoidance Actions");

(c)     modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Cash Collateral Orders;

(d)     except to the extent of the Carve Out (as defined herein), the waiver of all rights to surcharge any Prepetition Collateral or Collateral (as defined herein) under sections 506(c) or 552(b) of the Bankruptcy Code or any other applicable principle of equity or law;

(e)     the waiver of any applicable stay with respect to the effectiveness and enforceability of the Cash Collateral Orders (including a waiver pursuant to Bankruptcy Rule 6004(h)); and

(f)     granting related relief;

and following the interim hearing on the Motion held on November 2, 2017 (the "Interim Hearing"), the Court entered an interim order (the "Interim Order") approving the Motion on an interim basis; and the Court having held a final hearing on the Motion on November 30, 2017 (the "Final Hearing"); and due and sufficient notice of the Motion and the relief sought at the Final Hearing having been given pursuant to Bankruptcy Rules 2002, 4001 and 9014 by the Debtors to counsel to the Secured Notes Trustee (as defined below), counsel to the Ad Hoc Group (as defined below), other known lien creditors, the Debtors' fifty (50) largest unsecured creditors (on a consolidated basis), the United States Trustee for the Eastern District of Missouri (the "United States Trustee"), the United States Securities and Exchange Commission, the United States Internal Revenue Service, and all parties that have requested or are required to receive notice pursuant to Bankruptcy Rule 2002; and the Court having considered the Motion, the *Declaration of Alan Boyko of Armstrong Energy, Inc., in Support of Chapter 11 Petitions and First Day Motions* [ECF No. 5], the offers of proof and evidence adduced, and the statements of counsel made at the Interim and Final Hearing; and it appearing to the Court that granting the relief sought in the Motion on a final basis on the terms and conditions herein contained is necessary and essential to enable the Debtors to preserve the going concern value of the Debtors'

businesses and assets and that such relief is fair and reasonable and that entry of this Final Order

is in the best interest of the Debtors and their respective estates and creditors; and all objections,

if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled by the

Court; and after due deliberation and good cause having been shown to grant the relief sought in

the Motion,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.    **Petition Date**.  On November 1, 2017 (the "Petition Date"), Armstrong

Energy, Inc. ("Armstrong") and each of the other Debtors filed voluntary petitions for relief

under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the

Eastern District of Missouri (the "Court").  Each Debtor has continued with the management and

operation of its respective businesses and properties as a debtor in possession pursuant to

sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in

the Cases.  On November 8, 2017, pursuant to 11 U.S.C. § 1102(a) the United States Trustee

appointed the official committee of unsecured creditors (the "UCC").

B.    **Restructuring Transaction**.    Prior to the Petition Date, the Debtors

entered into: (a) that certain restructuring support agreement, dated October 5, 2017, by and

among the Debtors, the Ad Hoc Group, Knight Hawk Holdings, LLC ("Knight Hawk"), Rhino

Resource Partners Holdings LLC, and Thoroughbred Resources, L.P. (the "RSA"), which

contemplates, among other things, that the Debtors will pursue a sale of substantially of all their

assets (the "Sale") through a chapter 11 plan (the "Proposed Plan"); and (b) that certain

Transaction Agreement (the "Transaction Agreement"), dated November 1, 2017, by and among

the Debtors, Knight Hawk, and the Supporting Holders (as defined therein), pursuant to which

the parties thereto have agreed to effectuate the Sale on the terms described therein.  Such

transactions and documents, including any related or ancillary transactions or documents, are

collectively referred to herein as the "Restructuring Documents" or the "Restructuring Transactions", as applicable.

          C.    **Debtors' Stipulations**.  Without prejudice to the rights, if any, of any other party (but subject to the limitations thereon described in paragraphs 17 and 18 hereof), the Debtors admit, stipulate and agree that:

    i.    Pursuant to that certain indenture, dated as of December 21, 2012 (as supplemented and in effect from time to time, the "Secured Notes Indenture"), by and among Armstrong, the guarantors party thereto (the "Guarantors") and Wells Fargo Bank, National Association as Trustee and Collateral Agent (the "Secured Notes Trustee"), Armstrong (the "Issuer") issued in aggregate principal amount of $200,000,000 of 11.75% Senior Secured Notes due 2019 (the "Secured Notes", and holders thereof, the "Secured Noteholders").

    ii.    Pursuant to the Secured Notes Indenture, interest accrues on the Secured Notes at a rate of 11.75% annually and is payable semiannually, on June 15 and December 15 of each year.

    iii.    Armstrong failed to make the $11,750,000 interest payment due June 15, 2017 (the "June 2017 Interest Payment") and, as of the Petition Date, has not made such payment.

    iv.    As of the Petition Date, each Debtor, as Issuer or Guarantor, was jointly and severally indebted and liable, without defense, counterclaim, or offset of any kind, to the Secured Noteholders in the amount of (x) $200,000,000 in respect of the aggregate principal amount of the Secured Notes, (y)

$11,750,000 in respect of the June 2017 Interest Payment and (z) all interest that has accrued from June 15, 2017 through the Petition Date (such amounts, together with all other outstanding Obligations (as defined in the Secured Notes Indenture), including interest, fees, expenses and other charges, the "Secured Notes Indebtedness").

v.  The Secured Notes Indebtedness constitutes a legal, valid and binding obligation of the Debtors, enforceable in accordance with its terms, and no portion of the Secured Notes Indebtedness or any amounts paid to or for the benefit of the Secured Noteholders or applied to the obligations owing under the Secured Notes Indenture or Secured Notes prior to the Petition Date is subject to avoidance, subordination (whether equitable or otherwise), recharacterization, recovery, attack, offset, counterclaim, defense, challenge or Claim (as defined in section 101(5) of the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

D.  **Debtors' Admissions With Respect to Prepetition Collateral and Liens**.  Without prejudice to the rights, if any, of any other party in interest (but subject to the limitations thereon described herein in paragraphs 17 and 18), the Debtors admit, stipulate and agree that:

i.  Pursuant to (a) that certain Security Agreement (as amended and in effect, the "Security Agreement"), dated as of December 21, 2012, by the Issuer and the Guarantors and the Secured Notes Trustee, (b) that certain Pledge Agreement (as amended and in effect, the "Pledge Agreement"), dated as

of December 21, 2012 by the Issuer and the Guarantors (as such terms are defined in the Pledge Agreement) and the Secured Notes Trustee and (c) certain mortgages, deeds of trust or other security documents entered into by the Issuer and any Guarantor and the Secured Notes Trustee in respect of the assets and properties owned by such Issuer or Guarantor (each as heretofore amended, restated or otherwise modified from time to time, and, collectively with any and all other agreements, instruments, certificates, fixture filings, transmitting utility filings, financing statements, consents, assignments or other similar documents, and together with the Security Agreement and the Pledge Agreement, the "Secured Notes Collateral Documents" and, together with the Secured Notes Indenture and the Secured Notes, the "Secured Notes Documents"), they have granted valid, binding, perfected and enforceable liens upon and security interests in the real and personal property of the Issuer and Guarantors described in the Secured Notes Collateral Documents, which constitutes all or substantially all of the Issuer's and Guarantors' assets (subject to certain express exclusions set in the Secured Notes Collateral Documents) (collectively, the "Prepetition Collateral") to the Secured Notes Trustee for the benefit of the Secured Noteholders to secure the Secured Notes Indebtedness (the Secured Notes Trustee, together with the Secured Noteholders, the "Prepetition Secured Parties").

ii.     The Secured Notes Trustee's liens upon and security interests in the Prepetition Collateral, for the ratable benefit of the Senior Secured

- 6 -

Noteholders are first-priority liens, subject only to certain Senior Permitted Liens as described herein, and are not subject to avoidance, subordination (whether equitable or otherwise), recharacterization, recovery, attack, offset, counterclaim, defense, challenge or Claim (as defined in section 101(5) of the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

E.    **Debtors' Admissions With Respect to Cash Collateral**.    Without prejudice to the rights, if any, of any other party in interest (but subject to the limitations thereon described herein in paragraphs 17 and 18), the Debtors admit, stipulate and agree that:

i.    For purposes of this Final Order, the term "Cash Collateral" shall mean and include all "cash collateral" as defined in Bankruptcy Code section 363 now existing or hereinafter arising in which the Prepetition Secured Parties have a perfected lien, security interest or other interest, in each case whether existing on the Petition Date or arising pursuant to this Final Order or otherwise. The Debtors stipulate that, other than any cash or cash equivalent assets held in an account that has a balance of less than $10,000 as of the date hereof of which there are no more than ten (10) such accounts, all of the Debtors' cash, cash equivalents, negotiable instruments, and securities (but excluding amounts held in any trust, escrow and custodial funds as of the Petition Date in properly established trust, escrow and custodial accounts), and any amounts generated from the use, sale, lease or other disposition of the Prepetition Collateral, in each case wherever located, constitutes Cash Collateral and Prepetition

- 7 -

Collateral.   The Prepetition Secured Parties are entitled, pursuant to sections 105, 361, 362 and 363(e) of the Bankruptcy Code, to adequate protection of their interest in the Prepetition Collateral, including the Cash Collateral, for any Collateral Diminution (as defined herein).

F.   **Releases; Investigation**. Without prejudice to the rights of any other party (but subject to the limitations thereon described herein in paragraphs 17 and 18), each Debtor hereby forever waives and releases any and all Claims (as defined in section 101(5) of the Bankruptcy Code), counterclaims, lawsuits, rights to payment, causes of action, defenses or setoff rights against each of the Prepetition Secured Parties, in each case, arising under or related in any way to the Secured Notes Documents, whether arising at law or in equity, including, without limitation, any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or Chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law. The admissions, stipulations, agreements and releases set forth in paragraphs C, D, E and F of this Final Order are based upon and consistent with the Debtors' investigation of the Prepetition Secured Parties' liens and claims and independent determination that the Debtors have no Claims (as defined in section 101(5) of the Bankruptcy Code), defenses or counterclaims with respect thereto.

G.   **Need to Use Cash Collateral**.  The Debtors have requested entry of this Final Order pursuant to Bankruptcy Rule 4001(b)(2) and have an ongoing need to continue the use of the Prepetition Collateral, including the Cash Collateral (in the amount and  manner set forth herein and in the Budget (as defined herein)) to, among other things, preserve and maintain the going-concern value of their assets and businesses and maximize value for creditors.  A critical need exists for the Debtors to use Cash Collateral, consistent with the Budget, for

- 8 -

working capital and other general corporate purposes of the Debtors, including the payment of the costs and expenses of administering the Cases and pursuing the Restructuring Transactions. The ability of the Debtors to access liquidity through the use of the Cash Collateral is vital to the Debtors and their efforts to maximize the going-concern value of their assets. Absent entry of this Final Order, the Debtors' estates and efforts to maximize the going-concern value of their assets will be immediately and irreparably harmed.

H.    **Notice**.  Notice of the requested relief sought at the Final Hearing was provided by the Debtors to:  (1) the United States Trustee; (2) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (3) other known lien creditors; (4) counsel to the Secured Notes Trustee; (5) counsel to the Ad Hoc Group; (6) the United States Attorney's Office for the Eastern District of Missouri; (7) the Internal Revenue Service; (8) the United States Securities and Exchange Commission; (9) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (10) the state attorneys general for states in which the Debtors conduct business; and (11) any party that has requested notice pursuant to Bankruptcy Rule 2002.  Given the nature of the relief sought, the foregoing notice of the Final Hearing complies with Bankruptcy Rules 2002, 4001(b) and (d) and 9014, all applicable local rules, and section 102(1) of the Bankruptcy Code as required by sections 361 and 363 of the Bankruptcy Code.  No further notice of, or hearing on, the relief sought at the Final Hearing and the relief granted herein is necessary or required.

I.    **Ad Hoc Group of Senior Secured Noteholders**.  Certain holders of Secured Notes holding more than a majority of the aggregate principal amount of Secured Notes

have formed an ad hoc group (the "Ad Hoc Group") that has the power to direct the Secured

Notes Trustee pursuant to and subject to the terms of the  Secured Notes Indenture.[1]

J.        **Consent by Prepetition Secured Parties**.   The Prepetition Secured

Parties have indicated their consent to the Debtors' use of Cash Collateral, in accordance with

and subject to the terms and conditions provided for in this Final Order.

K.        **Jurisdiction and Venue**.   Consideration of the Motion constitutes a

"core-proceeding" as defined in 28 U.S.C. § 157(b)(2).   This Court has jurisdiction over this

proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.

Venue for the Cases and the proceedings on the Motion is proper in this district pursuant to 28

U.S.C. §§ 1408 and 1409.

L.        **Relief Essential; Best Interest**.   The relief requested in the Motion (and

as provided in this Final Order) is necessary, essential and appropriate for the continued

operation of the Debtors' businesses and the management and preservation of the going-concern

value of the Debtors' assets and the property of their estates.   It is in the best interest of the

Debtors' estates that the Debtors be allowed to use the Cash Collateral under the terms hereof.

The Debtors have demonstrated good and sufficient cause for the relief granted herein.

M.        **Arm's-Length, Good-Faith Negotiations**.   The terms of this Final Order

were negotiated in good-faith and at arm's-length between the Debtors and the Prepetition

Secured Parties.

N.        **Adequate Protection**.   Good cause was shown that the Prepetition

Secured Parties are entitled to adequate protection pursuant to sections 361, 362, and 363 of the

---

[1]    For the avoidance of doubt, nothing in this Final Order is intended to limit the respective rights and obligations
of the Secured Noteholders and the Secured Notes Trustee, as among themselves, under the Secured Notes
Indenture.

- 10 -

Bankruptcy Code.  Based on the Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements for the use of the Prepetition Collateral (including the Cash Collateral) are fair and reasonable and reflect the Debtors' prudent exercise of business judgment.  The Prepetition Secured Parties reserve the right to seek additional adequate protection beyond the adequate protection provided in this Final Order.

O.      **Sections 506(c) and 552(b)**.  In light of the agreement by the Prepetition Secured Parties to allow the Debtors to, among other things, use Cash Collateral on the terms set forth herein, each of the Prepetition Secured Parties is entitled to the benefits of a waiver of the provisions of section 506(c) of the Bankruptcy Code and any "equities of the case" claims under section 552(b) of the Bankruptcy Code.

**NOW, THEREFORE, UPON THE RECORD OF THE PROCEEDINGS HERETOFORE HELD BEFORE THIS COURT WITH RESPECT TO THE MOTION, THE EVIDENCE ADDUCED AT THE FINAL HEARING, AND THE STATEMENTS OF COUNSEL THERE AT, IT IS HEREBY ORDERED THAT:**

1.      **Motion Granted**.  The Motion is granted on a final basis in accordance with the terms of this Final Order.  Any objections to the Motion with respect to the entry of this Final Order that have not been withdrawn, waived or settled and all reservations of rights included therein, are hereby denied and overruled.

2.      **Authorization to Use Cash Collateral**. Subject to the terms and conditions of this Final Order, the Debtors are authorized to use Cash Collateral now existing or hereafter generated during the period beginning with the Petition Date and ending on the Termination Date (as defined herein), solely in the amounts and for the disbursements set forth in the 13-week cash disbursements and receipts budget attached to the Interim Order (the "Initial

Budget," and as modified by the Budget attached hereto as <u>Exhibit A</u> and as the same may hereafter be modified or extended from time to time by the Debtors as set forth in this paragraph and in paragraph 3(e)(v) of this Final Order, the "<u>Budget</u>"), subject to Permitted Deviations and any Non-Conforming Use (as each such term is defined below) permitted hereunder.  For any four-week period set forth in the Budget commencing the first full week following the Petition Date, the total net receipts shall not be less than 85% of the budgeted amount and the operating disbursements shall not exceed 115% (*provided* that Allowed Professional Fees and payments to the U.S. Trustee shall not be subject to such operating disbursement test) of the budgeted amount on an individual line item basis and on an aggregate basis (each, a "<u>Permitted Deviation</u>"); *provided* that any unused amount for any line item in the Budget during any four-week budget period may be carried forward into the next four-week budget period with respect to the same line item.  The Secured Notes Trustee, acting at the direction of the Ad Hoc Group, may, in accordance with the terms of such direction, agree in writing to the use of the Cash Collateral in a manner or amount which does not conform to the manner or amount, as applicable, set forth in the Budget (including, for the avoidance of doubt, after giving effect to the Permitted Deviation) (each such approved non-conforming use of Cash Collateral, a "<u>Non-Conforming Use</u>").  If such written consent is given (which consent may be given through email by the Secured Notes Trustee's counsel), the Debtors shall be authorized pursuant to this Final Order, or were authorized under the Interim Order, to use Cash Collateral for any such Non-Conforming Use without further Court approval, and the Prepetition Secured Parties shall be entitled to all of the protections specified in this Final Order for any such Non-Conforming Use; *provided* that each such permitted Non-Conforming Use shall be deemed a modification to the Budget for all testing

purposes.  The Debtors shall provide notice of any material Non-Conforming Use to counsel to UCC and the United States Trustee.

3. **Adequate Protection for the Prepetition Secured Parties**.  As adequate protection for, and to secure payment of an amount equal to the Collateral Diminution, and as an inducement to the Prepetition Secured Parties to permit the Debtors' use of the Cash Collateral and other Prepetition Collateral as provided for in this Final Order or the Interim Order, as applicable, the Debtors hereby grant the following:

(a) **Adequate Protection Liens**.  Effective as of the Petition Date and in each case perfected without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or by possession or control, the following security interests and liens (all such liens and security interests, the "Adequate Protection Liens") are hereby granted to the Secured Notes Trustee, for the benefit of the Secured Noteholders, (all property identified in clauses (i) and (ii) of this paragraph 3(a) being collectively referred to as the "Collateral"), subject only to the Carve Out (as defined herein) and Senior Permitted Liens as provided below:

i. **Liens Senior to Other Liens**.  A valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien on the Prepetition Collateral and all of the Debtors' now owned and hereafter-acquired real and personal property, assets and rights of any kind or nature, wherever located, including, without limitation, all prepetition and postpetition property of the Debtors' estates, and the proceeds, products, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise, including, without limitation, coal properties and leases (and as-extracted collateral, goods and fixtures relating thereto), mining and related permits (to the extent the Debtors can grant liens on such permits), the economic value of any permit or similar right that cannot be subject to a lien under applicable law, accounts receivable, other rights to payment, cash, inventory, general intangibles, contracts, servicing rights, servicing receivables, securities, chattel paper, owned real estate, real property leaseholds, fixtures, machinery, equipment, deposit accounts, patents, copyrights,

trademarks, trade names, rights under license agreements and other intellectual property, claims and causes of action (including those arising under section 549 of the Bankruptcy Code) and all proceeds of the foregoing, other than Avoidance Actions, which Adequate Protection Liens shall have recourse to the proceeds or property recovered in respect of any Avoidance Actions, subject only to valid, perfected and enforceable prepetition liens (if any) which are senior to, or *pari passu* with, the Prepetition Secured Parties' liens or security interests as of the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (each, a "<u>Senior Permitted Lien</u>"); *provided* that the foregoing collateral shall not include assets or property (other than Prepetition Collateral, including Cash Collateral) upon which, and solely to the extent that, the grant of an Adequate Protection Lien as contemplated in this Final Order, would constitute a default or event of default thereunder (and such default would not be excused by operation of the Bankruptcy Code), but shall include the proceeds thereof.

ii.    **Liens Junior to Existing Liens**.    A valid, binding, continuing, enforceable, fully-perfected junior lien on and security interest in all prepetition and postpetition property of the Debtors (other than the property described in clause (i) of this paragraph 3(a)), whether now existing or hereafter acquired, that is subject to a Senior Permitted Lien; *provided* that the foregoing collateral shall not include assets or property (other than Prepetition Collateral, including Cash Collateral) upon which, and solely to the extent that, the grant of an Adequate Protection Lien as contemplated in this Final Order, would constitute a default or event of default thereunder (and such default would not be excused by operation of the Bankruptcy Code), but shall include the proceeds thereof.

(b)    **Adequate Protection Claims**.    An allowed administrative claim (the "<u>Adequate Protection Claims</u>") against each of the Debtors on a joint and several basis with priority over any and all other administrative claims against the Debtors now existing or hereafter arising in the Cases (subject only to the Carve Out (as defined herein) and the super priority Claims for Expense Reimbursement (as defined and approved in connection with the Expense Reimbursement Motion [Docket No. 43]), including all claims of the kind specified under sections 503(b) and 507(b) of the

- 14 -

Bankruptcy Code, which administrative claim shall have recourse to and be payable from all prepetition and postpetition property of the Debtors including, without limitation, the proceeds or property recovered in respect of any Avoidance Actions ("Avoidance Action Proceeds"); *provided* that with respect to Avoidance Action Proceeds, the Secured Notes Trustee shall use commercially reasonable efforts to satisfy the Adequate Protection Claims from any available cash proceeds of Prepetition Collateral or Collateral (other than Avoidance Action Proceeds) before seeking recourse to Avoidance Action Proceeds to the extent reasonably practicable.

(c)     **Other Covenants**.     The Debtors shall maintain their cash management arrangements in a manner consistent with the order(s) granting the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief*, entered or to be entered substantially contemporaneously herewith.  The Debtors shall not use, sell, lease or otherwise dispose of any material assets outside the ordinary course of business, or seek authority of this Court to do any of the foregoing, without prior written consent of the Secured Notes Trustee, acting at the direction of the Ad Hoc Group.  The Debtors shall comply with the covenants contained in Sections 4.03 and 4.04 of the Secured Notes Indenture regarding the maintenance and insurance of the Prepetition Collateral and the Collateral.  The Debtors shall, on a reasonable basis, provide the Ad Hoc Group, the Secured Notes Trustee, and all potential strategic partners or purchasers identified by any Prepetition Secured Party access to all information and materials relating to the Debtors' businesses, financial condition and projections and the Chapter 11 Cases, including reasonable access to the Debtors' management and properties; *provided* that the Debtors may condition such access upon execution by such party of a reasonable non-disclosure agreement that the Debtors will complete with such party as expediently as reasonably practicable.  The Debtors shall continue to actively engage the chief restructuring officer provided by FTI Consulting, Inc. (the "CRO") in their business and operations and otherwise ensure that the CRO is properly utilized, including requesting that the CRO perform some or all of the services described in the CRO's engagement letter, which engagement letter shall only be modified with written consent of the Ad Hoc Group.

(d)     **Fees and Expenses**.     As additional adequate protection, the Debtors shall pay in cash:  (i) to the extent not paid pursuant to the

terms of the Interim Order, the reasonable professional fees, expenses and disbursements (including, but not limited to, the fees, expenses and disbursements of counsel and third-party consultants, including financial consultants and auditors) incurred by the Ad Hoc Group arising prior to the Petition Date, which shall include the reasonable professional fees, expenses, and disbursements incurred by the Ad Hoc Group (but not Knight Hawk) in connection with the Restructuring Transactions and the Restructuring Documents ("Transaction Costs") by the Ad Hoc Group; (ii) the reasonable professional fees, expenses and disbursements (including, but not limited to, the fees, expenses and disbursements of counsel and third-party consultants, including financial consultants and auditors) incurred by the Ad Hoc Group arising subsequent to the Petition Date, including Transaction Costs; (iii) to the extent not paid pursuant to the terms of the Interim Order, the reasonable fees, expenses and disbursements of the Secured Notes Trustee and legal counsel to the Secured Notes Trustee incurred prior to the Petition Date, including Transaction Costs; and (iv) the reasonable fees, expenses and disbursements of the Secured Notes Trustee and legal counsel to the Secured Notes Trustee incurred subsequent to the Petition Date, including Transaction Costs.   The payment of the fees, expenses and disbursements set forth in this paragraph 3(d) of this Final Order (including professional fees and expenses of Paul, Weiss, Rifkind, Wharton & Garrison LLP, Houlihan Lokey, Inc., one local bankruptcy counsel to the Ad Hoc Group, one local Kentucky and/or regulatory counsel to the Ad Hoc Group, the Secured Notes Trustee and legal counsel to the Secured Notes Trustee) shall be made within ten (10) business days after the receipt by the Debtors and the United States Trustee of invoices thereof (subject in all respects to applicable privilege or work product doctrines) and without the necessity of filing formal fee applications, including such amounts arising before and after the Petition Date. Notwithstanding the foregoing, payments made pursuant to this paragraph 3(d) shall be without prejudice, and with a full reservation of rights, to the UCC's ability in connection with a Challenge (as defined below) to seek to have such payments recharacterized or reallocated pursuant to section 506(c) of the Bankruptcy Code as payments of principal on account of the Senior Notes Indebtedness.

(e)    **Reporting**.  As additional adequate protection to the Prepetition Secured Parties, the Debtors shall provide the following reporting to the Secured Notes Trustee and Ad Hoc Group, as applicable, with copies to counsel to the UCC and Knight Hawk:

- 16 -

i. Weekly (or less frequently as may be agreed to by and among the Debtors, the Ad Hoc Group and the Secured Notes Trustee) calls with the Ad Hoc Group, the Secured Notes Trustee, the UCC, and their respective advisors;

ii. A copy of each update to the Debtors' business plan as soon as reasonably practicable after it becomes available, together with a reconciliation to the prior business plan;

iii. Presentations by the Debtors and/or their advisors during normal business hours to the Secured Notes Trustee, the Ad Hoc Group, the UCC, and/or their respective advisors at times and places as the Secured Notes Trustee, Ad Hoc Group, and counsel to the UCC, as applicable, may reasonably request in writing (including via electronic mail) with reasonable prior notice;

iv. Promptly, but in any event no later than the twentieth (20th) day of each calendar month, a report as of the last day of the preceding calendar month, in form and detail reasonably acceptable to the Secured Notes Trustee and Ad Hoc Group, of (a) the Debtors' accounts payable and disbursements for such month, (b) an accounts payable and an accounts receivable aging report, and (c) all written demands or claims made, related to, or asserting any liens in respect of property or assets of the Debtors (including liens imposed by law, such as landlord's, vendors', suppliers', carriers', warehousmen's, repairmen's, construction contractors', workers' and mechanics' liens and other similar liens) if the amount demanded or claimed exceeds $50,000 individually or $200,000 in the aggregate; *provided* that provisions (a) and (b) hereof may be satisfied by filing the Debtors' monthly operating report containing such information and serving such report on counsel for the Secured Notes Trustee, counsel for the Ad Hoc Group, counsel for the UCC and counsel for Knight Hawk;

v. (A) On or before the last Friday of each calendar month, an updated rolling 13-week cash flow forecast of the Debtors and their subsidiaries substantially in the form of the Initial Budget (each, a "Proposed Budget"), which Proposed Budget shall become the Budget effective as of the fifth business day of the next calendar month if the Secured Notes Trustee, acting at the direction of the Ad Hoc Group does not object (whether written or not) prior to such Proposed Budget becoming effective; and (B) on or before each Wednesday of each calendar week, (1) a weekly

- 17 -

report of receipts, disbursements and a reconciliation of actual expenditures and disbursements with those set forth in the Budget for the prior week (and on a cumulative four-week basis), which report and reconciliation shall be in form and detail reasonably satisfactory to the Ad Hoc Group and the Secured Notes Trustee (the "Budget Reconciliation") and (2) a statement setting forth in reasonable detail the cash balance for each deposit account of the Debtor and its subsidiaries as of the previous Friday;

vi.     Promptly, and in any event no later than the thirtieth (30th) day following the end of each month, beginning with the month ended November 30, 2017, a monthly and year-to-date income statement, balance sheet and monthly and year-to-date detail of capital expenditures;

vii.    Such other reports and information as the Secured Notes Trustee, the Ad Hoc Group, or the UCC may reasonably request.

(f)     **Asset Sales; Application of Proceeds**.  Except as contemplated by the Restructuring Documents, unless otherwise agreed to by the Secured Notes Trustee, acting at the direction or with the consent of the Ad Hoc Group, in writing (which may be via email), all non-ordinary course sales and other dispositions (including casualty and condemnation events) of Collateral ("Collateral Sales") shall be in exchange for 100% cash consideration.    Except as contemplated by the Restructuring Documents, any proposed property exchange with respect to Collateral that is not in exchange for 100% cash consideration shall be subject to the prior written consent of the Secured Notes Trustee, acting at the direction or with the consent of the Ad Hoc Group, which consent shall not be unreasonably withheld; all proceeds from Collateral Sales, as well as extraordinary receipts of any kind, shall be applied in accordance with the Secured Notes Documents unless otherwise agreed by the Secured Notes Trustee, acting at the direction or with the consent of the Ad Hoc Group, in writing (which may be via email).

(g)     **Case Milestones**.  Unless otherwise extended under the RSA with the consent of the Ad Hoc Group, the Debtors shall ensure compliance with the following case milestones:

1.     By no later than thirty one (31) days following the Petition Date, the Court shall have entered an order in form and substance acceptable to the Ad Hoc Group, the Secured Notes Trustee,    and    Knight    Hawk    approving    the    expense

reimbursement set forth in the Expense Reimbursement Motion or an expense reimbursement otherwise acceptable to the Ad Hoc Group, the Secured Notes Trustee, and Knight Hawk.

2. By no later than sixty (60) days following the Petition Date, the Court shall have entered an order reasonably acceptable to the Ad Hoc Group and Secured Notes Trustee approving the disclosure statement and plan solicitation procedures with respect to the Proposed Plan, each of which must be reasonably acceptable to the Ad Hoc Group and Secured Notes Trustee.

3. By no later than seventy five (75) days following the Petition Date, the Debtors shall share with the advisors to the Ad Hoc Group a draft budget for winding down the Debtors' operations and the Chapter 11 Cases after confirmation of the Plan, which includes an anticipated funding need in an amount acceptable to the Ad Hoc Group.

4. By no later than one hundred (100) days following the Petition Date, the Court shall enter an order reasonably acceptable to the Ad Hoc Group, the Secured Notes Trustee, and Knight Hawk confirming the Proposed Plan and approving the Sale and the other related transactions provided for therein (the "Confirmation and Sale Order").

5. By no later than fifteen (15) days following entry of the Confirmation and Sale Order, the effective date of the Plan shall occur and the Sale shall be consummated.

4.    **Collateral Diminution**.   For purposes of this Final Order, "Collateral Diminution" shall mean an amount equal to the diminution of the value of the Prepetition Secured Parties' interest in the Prepetition Collateral from and after the Petition Date resulting from the sale, lease, or use by the Debtors of the Prepetition Collateral, including Cash Collateral, or as a result of the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

5.    **Priority of Adequate Protection Liens and Adequate Protection Claims**.   The Adequate Protection Liens and Adequate Protection Claims granted to the Prepetition Secured Parties pursuant to paragraphs 3 and 4 of this Final Order shall not be subject

or junior to any lien or security interest that is avoided and preserved for the benefit of the

Debtors' estates under section 551 of the Bankruptcy Code and shall not be subordinated to or

made *pari passu* with any lien, security interest or administrative claim under section 364 of the

Bankruptcy Code or otherwise (other than the Carve Out and Claims for Expense

Reimbursement); *provided* that the Debtors shall not create, incur or suffer to exist any

postpetition liens or security interests other than:  (i) those granted pursuant to this Final Order;

(ii) carriers', mechanics', operator's, warehousemen's, repairmen's or other similar statutory

liens arising in the ordinary course of business; (iii) pledges and deposits in connection with

workers' compensation, unemployment insurance and other social security legislation; (iv)

deposits to secure the payment of any postpetition statutory obligations and performance bonds

and (v) Senior Permitted Liens; *provided* that such liens and deposits are in accordance with the

Budget.

<ol start="6">
<li><strong>Carve Out</strong>.</li>
</ol>

(a)    As used in this Final Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, but subject to paragraph 18, all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and any Committee appointed in the Cases (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by the Secured Notes Trustee of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount

not to exceed $1,250,000 incurred after the first business day following delivery by the Secured Notes Trustee of the Carve Out Trigger Notice, plus an amount, solely for the benefit of MAEVA Group, LLC, equal to the Completion Fee (as defined in that certain Advisory Agreement between MAEVA Group, LLC and Armstrong Energy, Inc. and its subsidiaries dated as of May 3, 2016 (as amended by the First Amendment to the Advisory Agreement dated as of October 31, 2017)) to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"). For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the Secured Notes Trustee to the Debtors, their lead restructuring counsel, counsel to Knight Hawk, the U.S. Trustee, and lead counsel to any statutory committee appointed in the Cases, which notice may be delivered following the occurrence and during the continuation of a Termination Event hereunder, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)     **Carve Out Reserve Account.** The Carve Out amounts for the fees and expenses of the Professional Persons shall be invoiced to the Debtors monthly and promptly deposited into an escrow account established by the Debtors and held in trust to pay Allowed Professional Fees of Professional Persons benefitting from the Carve Out prior to any and all other claims, with such funds being subject to the respective interests of the Prepetition Secured Parties such that any residual amount (the "Residual Amount") will be paid as provided in the Carve Out Reserve Account Priority (as defined below), but only after payment of all Allowed Professional Fees of Professional Persons benefitting from the Carve Out (the "Carve Out Reserve Account"). Allowed Professional Fees of Professional Persons benefitting from the Carve Out shall be paid from the Carve Out Reserve Account. The "Carve Out Reserve Account Priority" is the following payment priority from the Carve Out Reserve Account to the extent of the Residual Amount: first, to pay the Secured Notes Trustee for application in accordance with the Secured Notes Documents, unless the Secured Notes Indebtedness has been indefeasibly paid in full, in cash, and second, any remaining amount shall be retained by the Debtors' bankruptcy estates.

(c)     On the day on which a Carve Out Trigger Notice is given by the Secured Notes Trustee to the Debtors with a copy to lead counsel to any statutory committee appointed in the Cases (the "Termination Declaration Date"), the Debtors shall utilize all cash on hand as of such date and any available cash thereafter held by

any Debtor to fund the Carve Out Reserve Account in amount equal to the accrued and then unpaid Allowed Professional Fees that have not yet been deposited in the Carve Out Reserve Account plus the Post-Carve Out Trigger Notice Cap *provided* that the Debtors may use Cash Collateral in accordance with the Budget during the Default Notice Period.

(d)     Notwithstanding anything to the contrary in the Secured Notes Documents or this Final Order, following delivery of a Carve Out Trigger Notice, the Secured Notes Trustee shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserve Account has been fully funded. Further, notwithstanding anything to the contrary in this Final Order, (i) disbursements by the Debtors from the Carve Out Reserve Account shall not constitute Obligations (as defined in the Secured Notes Documents) or increase or reduce the Secured Notes Indebtedness, (ii) the failure of the Carve Out Reserve Account to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserve Account, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary herein or in the Secured Notes Documents, the Carve Out shall be senior to all liens and claims securing the Secured Notes Indebtedness, the Adequate Protection Liens, and any superpriority administrative claim (including Adequate Protection Claims), and any and all other forms of adequate protection, liens, or claims securing the Senior Notes Indebtedness.

(e)     **Payment of Allowed Professional Fees Prior to the Termination Declaration Date**. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(f)     **Payment of Carve Out On or After the Termination Declaration Date**. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.

7.     **Postpetition Lien Perfection**. Without the necessity of the filing of financing statements, security agreements, federal or state notices, pledge agreements,

recordings, mortgages or other documents or taking possession or control of any Collateral, this Final Order shall be sufficient evidence of the granting and perfection of the Adequate Protection Liens.  Notwithstanding the foregoing, the Debtors are authorized, empowered and directed to (a) execute such documents including, without limitation, mortgages, pledges and Uniform Commercial Code financing statements and (b) use Cash Collateral to pay such costs and expenses as may be reasonably requested by the Secured Notes Trustee or the Ad Hoc Group to provide further evidence of the perfection of the Adequate Protection Liens as provided for herein.  All such documents shall be deemed to have been recorded and filed as of the Petition Date.

8.    **Termination**.  The Debtors' right to use the Cash Collateral pursuant to this Final Order shall terminate (the date of any such termination, the "Termination Date") without further notice or court proceeding five (5) business days following the delivery of a written notice (any such notice, a "Default Notice") by the Secured Notes Trustee or counsel to the Ad Hoc Group to the Debtors, with a copy to Kirkland & Ellis LLP, counsel to Knight Hawk, the United States Trustee and lead counsel to the UCC (any such five-business-day period of time, the "Default Notice Period") of the occurrence of a Termination Event set forth below unless such occurrence is cured by the Debtors or waived by the Secured Notes Trustee as directed by the Ad Hoc Group prior to the expiration of the Default Notice Period with respect thereto; *provided* that, if a hearing to consider relief from the automatic stay, any other appropriate relief in connection with delivery of the Default Notice, or continued use of Cash Collateral (as may be held on an expedited basis as set forth in this paragraph 8) is requested to be heard within such five (5) business day period but is scheduled for a later date by the Court,

the Default Notice Period shall be automatically extended to the date of such hearing, but in no

event by more than two business days:

(a)    The failure to comply with any of the Case Milestones set forth in section 3(g) of this Final Order or any similar milestones set forth in the RSA;

(b)    Any termination of the RSA that is caused by a breach of the Debtors of their obligations under the RSA;

(c)    Any termination of the Transaction Agreement that is caused by a breach of the Debtors of their obligations thereunder;

(d)    The dismissal of the Cases or the conversion of the Cases to cases under Chapter 7 of the Bankruptcy Code;

(e)    The entry by this Court of an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code to any entity other than the Prepetition Secured Parties with respect to the Prepetition Collateral or the Collateral without the written consent of the Secured Notes Trustee, acting at the direction or with the consent of the Ad Hoc Group and the Secured Notes Trustee, which consent may be withheld in their sole discretion; *provided* that the foregoing shall not apply if all such subject Prepetition Collateral or Collateral to which the stay has been extended has a fair market value under $250,000 in the aggregate;

(f)    The appointment or election of a trustee, examiner with expanded powers or any other representative with expanded powers relating to the operation of the businesses in the Cases;

(g)    The filing of a plan of reorganization (other than the Proposed Plan) for and by the Debtors that is not supported by the Ad Hoc Group and the Secured Notes Trustee;

(h)    The failure by the Debtors to make any payment required pursuant to the Interim Order or this Final Order when due;

(i)    The failure by the Debtors to deliver to the Secured Notes Trustee and Ad Hoc Group any of the documents or other information required to be delivered pursuant to this Final Order when due or any such documents or other information shall contain a material misrepresentation;

(j)    The loss of the Debtors' exclusive right to file a plan pursuant to section 1121 of the Bankruptcy Code, regardless of how or when the Debtors lose such right;

(k)     The failure by the Debtors to adhere to the Budget except, in each instance, with respect to Permitted Deviations or Non-Conforming Uses;

(l)     The failure by the Debtors to observe or perform any of the material terms or material provisions contained herein;

(m)     The Debtors shall create, incur or suffer to exist any postpetition liens or security interests on the Collateral other than those permitted pursuant to paragraph 5 of this Final Order;

(n)     The Debtors shall create, incur or suffer any other post-petition claim which is *pari passu* with or senior to the Adequate Protection Claims, other than the Carve Out;

(o)     A filing by any Debtor of any motion, pleading, application or adversary proceeding challenging the validity, enforceability, perfection or priority of the liens securing the Secured Notes or asserting any other cause of action against and/or with respect to the Secured Notes Indebtedness, the Prepetition Collateral securing the Secured Notes or any of the Prepetition Secured Parties (or if the Debtors support, or fail to object to, any such motion, pleading, application or adversary proceeding commenced by any third party);

(p)     The entry of an order reversing, staying, vacating or otherwise modifying in any material respect the terms of this Final Order without the consent of the Ad Hoc Group and the Secured Notes Trustee.

Each of subparagraph (a) through (p) is referred to herein as a "Termination Event."  Upon and after delivery of the Default Notice, the Debtors and each of the Secured Notes Trustee and the Ad Hoc Group consent to a hearing on an expedited basis to consider whether (x) a Termination Event has occurred, (y) the automatic stay may be lifted so that the Prepetition Secured Parties may exercise any and all of their respective rights and remedies in respect of the Collateral in accordance with this Final Order, the applicable Secured Notes Documents, or applicable law, or (z) to consider any other appropriate relief (including, without limitation (i) the Secured Notes Trustee, acting at the direction of the Ad Hoc Group, foreclosing upon and selling all or a portion of the Prepetition Collateral or Collateral to collect any amounts due to the Prepetition Secured

Parties under the Secured Notes Indenture or pursuant to this Final Order and apply the same in accordance with the Secured Notes Documents (ii) to the extent relevant, what is the quantum of the Collateral Diminution and (iii) the Debtors' use of Cash Collateral on a nonconsensual basis); *provided* that the rights of the Debtors to oppose any relief requested by the Prepetition Secured Parties and/or the Ad Hoc Group (and the rights of any Prepetition Secured Party or the Ad Hoc Group to oppose any request for relief by the Debtors or any other party-in-interest, including for the use of Cash Collateral on a nonconsensual basis) are, in each case, fully reserved.  During the Default Notice Period, the Debtors shall be entitled to continue to use the Cash Collateral in accordance with the terms of the Budget and this Final Order.  Any delay or failure of a Prepetition Secured Party to exercise rights under the Secured Notes Documents or this Final Order shall not constitute a waiver of their respective rights hereunder, thereunder or otherwise. Notwithstanding the occurrence of the Termination Date or anything herein, all of the rights, remedies, benefits and protections provided to the Prepetition Secured Parties under the Secured Notes Documents and this Final Order shall survive the Termination Date.

9.     **Limited Usage of Cash Collateral**. The Debtors are authorized to use Cash Collateral solely as permitted by and in accordance with this Final Order and the Budget, and for such other expenses as may be agreed to by the Secured Notes Trustee, acting at the direction or with the consent of the Ad Hoc Group, in their sole discretion.

10.     **Limitation on Charging Expenses Against Collateral**.  All rights to surcharge any Prepetition Collateral or Collateral under section 506(c) of the Bankruptcy Code or any other applicable principle or equity or law shall be and are hereby waived, and such waiver shall be binding upon the Debtors and all parties in interest in the Cases; *provided* that the

Debtors reserve the right to seek the nonconsensual use of Cash Collateral on any basis, and the Prepetition Secured Parties reserve their rights to contest any such use on any basis.

11.     **Reservation of Rights of the Prepetition Secured Parties**.  This Final Order and the transactions contemplated hereby shall be without prejudice to (i) the rights of the Prepetition Secured Parties to seek additional or different adequate protection, move to vacate the automatic stay, move for the appointment of a trustee or examiner, move to dismiss or convert the Cases, or to take another action in the Cases and to appear and be heard in any matter raised in the Cases, and (ii) any and all rights, remedies, claims and causes of action which the Prepetition Secured Parties may have against any non-Debtor party liable for the Secured Notes Indebtedness.

12.     **Modification of Automatic Stay**.  The Debtors are authorized and directed to perform all acts and to make, execute and deliver any and all instruments as may be reasonably necessary to implement the terms and conditions of this Final Order and the transactions contemplated hereby.  The stay of section 362 of the Bankruptcy Code is hereby modified to permit the Debtors and each of the Prepetition Secured Parties to accomplish the transactions contemplated by this Final Order.

13.     **Survival of Final Order**.  The provisions of this Final Order shall be binding upon any trustee appointed during the Cases or upon a conversion to cases under Chapter 7 of the Bankruptcy Code, and any actions taken pursuant hereto shall survive entry of any order which may be entered converting the Cases to Chapter 7 cases, dismissing the Cases under section 1112 of the Bankruptcy Code or otherwise, or confirming or consummating any plan(s) of reorganization or liquidation.  The terms and provisions of this Final Order, as well as the priorities in payments, liens, and security interests granted pursuant to this Final Order shall

continue notwithstanding any conversion of the Cases to Chapter 7 cases under the Bankruptcy Code, dismissal of the Cases or confirmation or consummation of any plan(s) of reorganization or liquidation.  Subject to the limitations described in paragraphs 17 and 18 of this Final Order, the adequate protection payments made pursuant to this Final Order shall not be subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance in the Cases or any subsequent Chapter 7 cases (other than a defense that the payment has actually been made).

14.    **No Liability to Third Parties**.  In permitting the use of the Prepetition Collateral (including the Cash Collateral) or in exercising any rights or remedies as and when permitted pursuant to this Final Order, the Secured Notes Documents, or any applicable law, the Prepetition Secured Parties shall not: (i) be deemed to be in "control" of the operations of the Debtors; (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; (iii) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act of 1980 or any similar federal or state statute); and (iv) be deemed to be acting as a permittee, operator or any other person with liability for reclamation obligations under the Surface Mining Control and Reclamation Act of 1977 and similar state statutes.

15.    **Binding Effect**.  The terms of this Final Order shall be valid and binding upon the Debtors, all creditors of the Debtors and all other parties in interest from and after the entry of this Final Order by this Court.  In the event the provisions of this Final Order are reversed, stayed, modified or vacated following any further hearing, such reversals, modifications, stays or vacatur shall not affect the rights and priorities of the Prepetition Secured Parties granted pursuant to this Final Order.

- 28 -

16.    **Reversal, Stay, Modification or Vacatur**.  Notwithstanding any such reversal, stay, modification or vacatur, any indebtedness, obligation or liability incurred by the Debtors pursuant to this Final Order or the Interim Order, as applicable, arising prior to the Secured Notes Trustee and Ad Hoc Group's receipt of notice of the effective date of such reversal, stay, modification or vacatur shall be governed in all respects by the original provisions of this Final Order, and the Prepetition Secured Parties shall continue to be entitled to all of the rights, remedies, privileges and benefits, including any payments authorized herein and the security interests and liens granted herein, with respect to any such indebtedness, obligation or liability, and the validity of any payments made or obligations owed or credit extended or lien or security interest granted pursuant to this Final Order is and shall remain subject to the protection afforded hereunder and under the Bankruptcy Code.

17.    **Reservation of Certain Third Party Rights and Bar of Challenge and Claims**.  The Debtors' admissions and releases contained in paragraphs C, D, E and F of this Final Order:  (i) shall be binding upon the Debtors for all purposes; and (ii) shall be binding upon all other parties in interest, including the Committee, if any, for all purposes unless and only to the extent (1) a party other than the Debtors (subject in all respects to any agreement or applicable law which may limit or affect such entities right or ability to do so) has properly filed an adversary proceeding or contested matter by no later than the date that is sixty (60) days from the date of entry of the Interim Order or, in the case of the UCC, seventy-five (75) days from the date the UCC was appointed (the "Committee Challenge Deadline") (*provided* that so long as the UCC has filed a motion with the Court prior to the Committee Challenge Deadline seeking standing to pursue a Challenge, then the Committee Challenge Deadline shall be extended until the date that is two (2) business days after the Court rules on such request) (x) challenging the

amount, validity, enforceability, priority or extent of the Secured Notes Indebtedness or the Prepetition Secured Parties' security interests in and liens upon the Prepetition Collateral, or (y) otherwise asserting any claims or causes of action against the Prepetition Secured Parties on behalf of the Debtors' estates, and (2) a final decision has been rendered in favor of the plaintiff in any such timely and properly filed adversary proceeding or contested matter (each a "Challenge").  If no such Challenge is properly filed as of such dates or to the extent a final decision in favor of the plaintiff is not rendered in any such proceeding, then:  (a) the Debtors' admissions and releases contained in paragraphs C, D, E and F of this Final Order shall be binding on all parties in interest, including the UCC and any other statutory committee; (b) the Secured Notes Indebtedness of the Debtors under the Secured Notes Documents, including the June 2017 Interest Payment, shall constitute allowed secured claims for all purposes in the Cases, and any subsequent Chapter 7 case(s); (c) subject only to the Senior Permitted Liens, the Prepetition Secured Parties' security interests in and liens upon the Prepetition Collateral shall be deemed to have been, as of Petition Date, legal, valid, binding, and perfected first-priority security interests and liens, not subject to recharacterization, subordination or otherwise avoidable; and (d) the Secured Notes Indebtedness and the Prepetition Secured Parties' security interests in and liens on the Prepetition Collateral shall not be subject to any other or further challenge by the Committee or any other party in interest seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto.  If any such adversary proceeding or contested matter is properly filed as of such dates, the Debtors' admissions and releases contained in paragraphs C, D, E and F of this Final Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) except to the extent that such admissions and releases were expressly and successfully challenged in such adversary

proceeding or contested matter.  Nothing contained in this Final Order shall be deemed to grant standing to the UCC or any other party to commence any such adversary proceeding or contested matter.

18.     **Limitation on Use of Collateral**.  Notwithstanding the foregoing or any other provision of this Final Order, no Cash Collateral may be used to: (a) object to, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of the Secured Notes Indebtedness, or the liens or claims granted under this Final Order or the Secured Notes Documents and/or assert any claims, defenses or causes of action against the Prepetition Secured Parties or their respective agents, affiliates, representatives, attorneys, or advisors; (b) prevent, hinder, or otherwise delay the Secured Notes Trustee's assertion, enforcement, or realization on the Cash Collateral or the Collateral in accordance with the Secured Notes Documents or this Final Order; (c) seek to modify any of the rights granted in this Final Order or the Secured Notes Documents without the Secured Notes Trustee and Ad Hoc Group's prior written consent; or (d) pay any amount on account of any claims arising prior to the Petition Date unless such payments are approved by an Order of this Court and otherwise provided for in accordance with the Budget.  Notwithstanding the foregoing, advisors to the Committee may investigate the claims and liens of the Prepetition Secured Parties prior to the Committee Challenge Deadline at an aggregate expense not to exceed $150,000; *provided* that nothing in this paragraph 18 shall be considered a cap or limitation on the amount of Allowed Professional Fees due and payable by the Debtors.

19.     **Enforceability; Waiver of Any Applicable Stay**.  This Final Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy

Rules 6004(h), 6006(d), 7062 or 9014 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

20. **No Impact on Certain Contracts or Transactions**. No rights of any entity in connection with a contract or transaction of the kind listed in sections 555, 556, 559, 560 and 561 of the Bankruptcy Code, whatever they might or might not be, are affected by the provisions of this Final Order.

21. **Proofs of Claim**. None of the Prepetition Secured Parties will be required to file proofs of claim in any of the Cases or successor cases with respect to the Secured Notes Indebtedness, and the Debtors' stipulations in paragraphs C, D, E and F herein shall be deemed to constitute a timely filed proof of claim against the applicable Debtors. Notwithstanding the foregoing, the Secured Notes Trustee is hereby authorized and entitled, but not required, to file (and amend and/or supplement, as it sees fit) a consolidated proof of claim against all of the Debtors in accordance with the Secured Notes Indenture; *provided*, that nothing herein shall waive the right of any Prepetition Secured Party to file its own proofs of claim against the Debtors.

22. **Section 552(b) of the Bankruptcy Code**. The Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, products, offspring or profits of any of the Prepetition Collateral or the Collateral.

23. **No Marshaling**. Other than as provided in the proviso to paragraph 3(b) hereof, no Prepetition Secured Party shall be subject to the equitable doctrine of "marshaling" or

any other similar doctrine with respect to any of the Prepetition Collateral or Collateral, as applicable.

       24.    **Headings**.  The headings in this Final Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Final Order.

      No later than two business days after entry of this Final Order, the Debtors shall serve a copy of this Final Order on the Notice Parties and shall file a certificate of service no later than twenty-four (24) hours after service.

                                              *Kathy A. Surratt-States*

                                      KATHY A. SURRATT-STATES
                              Chief United States Bankruptcy Judge

DATED:  December 1, 2017
St. Louis, Missouri
jjh

- 33 -

**Order Prepared By:**

Richard W. Engel, Jr., MO 34641
Erin M. Edelman, MO 67374
John G. Willard, MO 67049
**ARMSTRONG TEASDALE LLP**
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri 63105
Telephone: (314) 621-5070
Facsimile:  (314) 621-2239
Email:  rengel@armstrongteasdale.com
Email:  eedelman@armstrongteasdale.com
Email:  jwillard@armstrongteasdale.com

James H.M. Sprayregen, P.C.
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
William A. Guerrieri (admitted *pro hac vice*)
Travis M. Bayer (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile:  (312) 862-2200
Email:  james.sprayregen@kirkland.com
Email:  ross.kwasteniet@kirkland.com
Email:  will.guerrieri@kirkland.com
Email:  travis.bayer@kirkland.com

Jonathan S. Henes, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:  jonathan.henes@kirkland.com

*Counsel to the Debtors*

## **EXHIBIT A**

### **Budget**

# Cash Collateral Budget as of 11/24/2017

| Week:<br>Actual / Forecast | 20-Nov<br>Fcst | 27-Nov<br>Fcst | 4-Dec<br>Fcst | 11-Dec<br>Fcst | 18-Dec<br>Fcst | 25-Dec<br>Fcst | 1-Jan<br>Fcst | 8-Jan<br>Fcst | 15-Jan<br>Fcst | 22-Jan<br>Fcst | 29-Jan<br>Fcst | 5-Feb<br>Fcst | 12-Feb<br>Fcst | 19-Feb<br>Fcst | 13-Week<br>Total<br>Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash Balance** | $33,568,611 | $31,514,227 | $30,638,638 | $28,169,490 | $27,247,886 | $21,928,178 | $21,624,657 | $18,548,446 | $14,790,721 | $14,133,827 | $14,159,298 | $10,315,375 | $ 6,751,688 | $ 9,034,897 | $ 33,568,611 |
| | | | | | | | | | | | | | | | |
| _Estimated Receipts_ | | | | | | | | | | | | | | | |
| **Total Receipts** | 476,080 | 5,094,889 | 328,734 | 5,791,341 | 583,832 | 4,488,004 | 193,467 | 983,475 | 2,646,892 | 5,167,349 | 935,781 | 550,000 | 4,881,333 | 687,500 | 32,808,677 |
| | | | | | | | | | | | | | | | |
| _Estimated Disbursements - STL_ | | | | | | | | | | | | | | | |
| Pay & Benefits (STL) | 250,000 | 831,448 | 250,000 | 350,000 | 250,000 | 831,448 | 250,000 | 250,000 | 350,000 | 250,000 | 831,448 | 250,000 | 350,000 | 250,000 | 5,544,344 |
| Lease Payments | 133,765 | 252,270 | 185,947 | 205,340 | 175,884 | 11,865 | 407,707 | 205,340 | 168,475 | 7,410 | 252,270 | 155,436 | 199,271 | 175,884 | 2,536,864 |
| Commissions and Royalties | (0) | 1,200 | - | - | 1,230,685 | 773 | 601,200 | - | - | 573,696 | 1,200 | - | - | 1,021,261 | 3,430,016 |
| SG&A | 50,000 | 81,000 | 56,500 | 50,000 | 110,000 | 81,000 | 176,500 | 50,000 | 95,000 | 50,000 | 81,000 | 56,500 | 50,000 | 95,000 | 1,082,500 |
| **Total Estimated Disbursements - STL** | 433,765 | 1,165,918 | 492,447 | 605,340 | 1,766,569 | 925,086 | 1,435,407 | 505,340 | 613,475 | 881,106 | 1,165,918 | 461,936 | 599,271 | 1,542,145 | 12,593,724 |
| | | | | | | | | | | | | | | | |
| _Estimated Disbursements - MDV_ | | | | | | | | | | | | | | | |
| Pay & Benefits (MDV) | - | 1,756,000 | - | 2,448,785 | - | 1,646,250 | - | 1,802,099 | - | 1,536,500 | - | 1,536,500 | - | 1,622,099 | 12,348,233 |
| Direct Mining Costs | 2,041,700 | 2,120,521 | 1,875,435 | 2,376,771 | 2,194,471 | 1,914,271 | 1,734,271 | 2,299,271 | 1,444,471 | 2,664,271 | 1,531,250 | 2,085,250 | 1,230,450 | 2,450,250 | 27,951,653 |
| Taxes | - | 203,038 | 30,000 | 882,049 | 600,000 | 80,918 | - | 110,918 | 368,091 | - | 592,737 | 30,000 | 768,404 | - | 3,677,155 |
| **Total Estimated Disbursements - MDV** | 2,041,700 | 4,079,559 | 1,905,435 | 5,707,605 | 2,794,471 | 3,641,439 | 1,734,271 | 4,212,288 | 1,812,562 | 4,200,771 | 2,123,987 | 3,651,750 | 1,998,854 | 4,072,349 | 43,977,041 |
| | | | | | | | | | | | | | | | |
| _Estimated Chapter 11 Disbursements_ | | | | | | | | | | | | | | | |
| Utility Deposits | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees | - | 125,000 | - | - | 1,242,500 | 125,000 | - | - | 877,750 | - | 1,490,800 | - | - | 793,167 | 4,653,217 |
| US Trustee Fees | - | - | - | - | - | - | - | - | - | 60,000 | - | - | - | - | 60,000 |
| Shippers / Lienholders | 55,000 | 600,000 | 400,000 | 400,000 | 100,000 | 100,000 | 100,000 | 23,571 | - | - | - | - | - | - | 1,778,571 |
| **Total Estimated Chapter 11 Disbursements** | 55,000 | 725,000 | 400,000 | 400,000 | 1,342,500 | 225,000 | 100,000 | 23,571 | 877,750 | 60,000 | 1,490,800 | - | - | 793,167 | 6,491,788 |
| | | | | | | | | | | | | | | | |
| **Total Disbursements** | 2,530,465 | 5,970,477 | 2,797,882 | 6,712,946 | 5,903,540 | 4,791,525 | 3,269,677 | 4,741,200 | 3,303,786 | 5,141,877 | 4,780,705 | 4,113,686 | 2,598,124 | 6,407,661 | 63,062,553 |
| | | | | | | | | | | | | | | | |
| **Net Cash Flow** | (2,054,385) | (875,588) | (2,469,148) | (921,604) | (5,319,708) | (303,521) | (3,076,211) | (3,757,725) | (656,895) | 25,472 | (3,843,923) | (3,563,686) | 2,283,208 | (5,720,161) | (30,253,876) |
| | | | | | | | | | | | | | | | |
| **Ending Cash Balance** | $31,514,227 | $30,638,638 | $28,169,490 | $27,247,886 | $21,928,178 | $21,624,657 | $18,548,446 | $14,790,721 | $14,133,827 | $14,159,298 | $10,315,375 | $ 6,751,688 | $ 9,034,897 | $ 3,314,736 | $ 3,314,736 |





Case 17-47541 Doc 988 Filed 12/01/17 Entered 12/01/17 08:59:03 Main Document Pg 36 of 36