**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ARMSTRONG ENERGY, INC., *et al.*, | ) | Case No. 17-47541-659 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |
|  | ) | Related Docket Nos. 45 |

**ORDER (I) AUTHORIZING**
**THE EMPLOYMENT AND RETENTION OF**
**MAEVA GROUP, LLC AS FINANCIAL ADVISOR FOR**
**THE DEBTORS AND DEBTORS IN POSSESSION, *NUNC PRO TUNC***
**TO THE PETITION DATE, (II) WAIVING CERTAIN INFORMATION**
**DISCLOSURE REQUIREMENTS, AND (III) GRANTING RELATED RELIEF**

Upon the application (the "Application")[1] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order") authorizing the Debtors to employ and retain MAEVA Group, LLC ("MAEVA") as their financial advisor effective *nunc pro tunc* to the date of commencement of these Chapter 11 cases (the "Petition Date") and waiving certain time-keeping requirements as set forth in the Appendix to the Procedures Manual accompanying the Local Rules of Bankruptcy Procedure for the United States Bankruptcy Court for the Eastern District of Missouri, all as more fully set forth in the Application; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Rule 81-9.01(B)(1) of the Local Rules of the United States District Court for the Eastern District of Missouri; and this Court having found that venue of this proceeding and the Application in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found based on the representations made in the

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Application or the Engagement Letter.

KE 47909796

Application and in the Wilson Declaration that (a) MAEVA does not hold or represent an interest adverse to the Debtors' estates and (b) MAEVA is a "disinterested person" as defined in section 101(14) of title 11 of the United States Code (the "Bankruptcy Code") and as required by section 327(a) of the Bankruptcy Code; and this Court having found that the terms and conditions of MAEVA's employment in the Engagement Letter, including but not limited to the Fee and Expense Structure and Indemnification Provisions set forth in the Engagement Letter, are reasonable as required by section 328(a) of the Bankruptcy Code; and this Court having found that the relief requested in the Application is necessary and essential for the Debtors' reorganization and is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Application and opportunity for a hearing on the Application were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Application and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Application and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.      The Application is approved and granted as set forth herein.

2.      The Debtors are authorized, pursuant to sections 327 and 328(a) of the Bankruptcy Code, Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2014 and 2016-1 of the Local Rules of Bankruptcy Procedure for the United States Bankruptcy Court for the Eastern District of Missouri (the "Local Bankruptcy Rules"), to

employ and retain MAEVA as their financial advisor in accordance with the terms and conditions set forth in the Engagement Letter, effective *nunc pro tunc* to the Petition Date, and to pay fees and reimburse expenses to MAEVA on the terms and times specified in the Engagement Letter.

3.     The terms of the Engagement Letter, attached hereto as **Exhibit 1**, are approved in all respects except as limited or modified herein.

4.     All of MAEVA's compensation set forth in the Engagement Letter, including, without limitation, the Fee and Expense Structure, is approved pursuant to section 328(a) of the Bankruptcy Code, and MAEVA shall be compensated and reimbursed pursuant to section 328(a) of the Bankruptcy Code in accordance with the terms of the Engagement Letter, subject to the procedures set forth in the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and any other applicable orders of this Court; *provided* that nothing in this Order or the Application shall be deemed to approve the payment of the fee described in section 14.e of the Engagement Letter, and the Debtors shall only pay the fee described in section 14.e of the Engagement Letter during these chapter 11 cases upon separate application and approval by this Court; *provided, further,* that nothing in the foregoing shall restrict the Board of the post-effective date Debtors from paying the fee described in section 14.e of the Engagement Letter, in its sole discretion.

5.     MAEVA shall file a fee application for final allowance of compensation for services and reimbursement of expenses pursuant to the procedures set forth in sections 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules; *provided* that the fee applications filed by MAEVA shall be subject to review only pursuant to the

standard of review set forth in section 328 of the Bankruptcy Code and not subject to the standard of review set forth in section 330 of the Bankruptcy Code.

6.     Notwithstanding any provision to the contrary in this Order, the U.S. Trustee shall have the right to object to MAEVA's request(s) for final compensation based on the reasonableness standard provided in section 330 of the Bankruptcy Code, not section 328(a) of the Bankruptcy Code.  This Order and the record relating to this Court's consideration of the Application shall not prejudice or otherwise affect the rights of the U.S. Trustee to challenge the reasonableness of MAEVA's fees under the standard set forth in the preceding sentence. Accordingly, nothing in this Order or the record shall constitute a finding of fact or conclusion of law binding the U.S. Trustee, on appeal or otherwise, with respect to the reasonableness of MAEVA's fees.

7.     MAEVA is granted a waiver of the recordkeeping requirements relating to compensation requests set forth in Local Bankruptcy Rule 2016-1(B) to the extent requested in the Application.  MAEVA shall not be required to submit time records in support of its fee applications.

8.     The Debtors are authorized to pay MAEVA's monthly invoices under the procedures set forth in Local Bankruptcy Rule 2016-2(B) and any applicable orders of this Court.

9.     The Debtors shall be bound by the indemnification, contribution, reimbursement, exculpation and other provisions of the Engagement Letter and will indemnify and hold harmless MAEVA and the other Indemnified Parties, pursuant to the Engagement Letter, subject, during the pendency of these chapter 11 cases, to the following:

    (a)    MAEVA shall not be entitled to indemnification, contribution or reimbursement pursuant to the Engagement Letter for services, unless such services and the indemnification, contribution or reimbursement therefor are approved by the Court;

    (b)    The Debtors shall have no obligation to indemnify MAEVA, or provide contribution or reimbursement to MAEVA, for any claim or expense that is either:  (i) judicially determined (the determination having become final) to have arisen from MAEVA's gross negligence, fraud, willful misconduct, breach of fiduciary duty, if any, bad faith, or self-dealing; (ii) for a contractual dispute in which the Debtors allege the breach of MAEVA's contractual obligations, unless the Court determines that indemnification, contribution or reimbursement would be permissible pursuant to *In re United Artists Theatre Co.*, 315 F.3d 217 (3d Cir. 2003); or (iii) settled prior to a judicial determination as to the exclusions set forth in clauses (i) and (ii) above, but determined by this Court, after notice and a hearing, to be a claim or expense for which MAEVA should not receive indemnity, contribution or reimbursement under the terms of the Engagement Letter as modified by this Order; and

    (c)    If, before the earlier of (i) the entry of an order confirming a chapter 11 plan in these cases (that order having become a final order no longer subject to appeal) and (ii) the entry of an order closing these chapter 11 cases, MAEVA believes that it is entitled to the payment of any amounts by the Debtors on account of the Debtors' indemnification, contribution and/or reimbursement obligations under the Engagement Letter (as modified by this Order), including, without limitation, the advancement of defense costs, MAEVA must file an application therefor in this Court, and the Debtors may not pay any such amounts to MAEVA before the entry of an order by this Court approving the payment.  This subparagraph (c) is intended only to specify the period of time under which the Court shall have jurisdiction over any request for fees and expenses by MAEVA for indemnification, contribution or reimbursement, and not a provision limiting the duration of the Debtors' obligation to indemnify MAEVA. All parties in interest shall retain the right to object to any demand by MAEVA for indemnification, contribution or reimbursement.

10.    Notwithstanding the possible applicability of Bankruptcy Rules 6004, 7062, or 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

11.     The relief granted herein shall be binding upon any chapter 11 trustee appointed in these chapter 11 cases, or upon any chapter 7 trustee appointed in the event of a subsequent conversion of these chapter 11 cases to cases under chapter 7.

12.     To the extent that there may be any inconsistency between the terms of the Application, the Engagement Letter, and this Order, the terms of this Order shall govern.

No later than two (2) business days after the date of this Final Order, the Debtors shall serve a copy of the Order on the Notice Parties and shall file a certificate of service no later than 24 hours after service.

*Kathy a. Surratt - States*

KATHY A. SURRATT-STATES
Chief United States Bankruptcy Judge

DATED:  December 1, 2017
St. Louis, Missouri
jjh

6

**Order Prepared By:**

Richard W. Engel, Jr., MO 34641
Erin M. Edelman, MO 67374
John G. Willard, MO 67049
**ARMSTRONG TEASDALE LLP**
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri 63105
Telephone: (314) 621-5070
Facsimile:  (314) 621-2239
Email:  rengel@armstrongteasdale.com
Email:  eedelman@armstrongteasdale.com
Email:  jwillard@armstrongteasdale.com

James H.M. Sprayregen, P.C.
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
William A. Guerrieri (admitted *pro hac vice*)
Travis M. Bayer (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile:  (312) 862-2200
Email:  james.sprayregen@kirkland.com
Email:  ross.kwasteniet@kirkland.com
Email:  will.guerrieri@kirkland.com
Email:  travis.bayer@kirkland.com

Jonathan S. Henes, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:  jonathan.henes@kirkland.com

*Counsel to the Debtors*

KE 47909796

## <u>EXHIBIT 1</u>

**Engagement Letter**

ADVISORY AGREEMENT

Armstrong Energy, Inc.
7733 Forsyth Boulevard
Suite 1625
St. Louis, MO 63105
Attention: Martin Wilson

This letter (this *Agreement*, and the engagement pursuant to this Agreement, *this Engagement*), entered into as of May 3 rd 2016 (the *Effective Date*), confirms the engagement of MAEVA Group, LLC (*MAEVA*, *we* or *us*) to provide advisory services to Armstrong Energy, Inc. and its subsidiaries (collectively, the *Company* or *you*).

1.    MAEVA and the Company agree that MAEVA will provide financial advisory, analytical, consulting and/or other services on one or more specific transactions, refinancings, investments, restructurings, value enhancing events and/or strategic initiatives involving the Company, its assets and/or obligations (collectively, the *Project*). The terms and conditions of this Agreement shall apply to the Project unless otherwise mutually agreed.

2.    In addition to the general services relating to the Project, MAEVA will provide to the Company the following services in connection with the Project, as may be requested by the Company from time to time during the term of this Agreement:

> a.    Advise and assist the Company in its analysis and monitoring of the Company's historical, current and projected financial affairs, including as appropriate without limitation, reviewing: periodic operating reports, analyses of cash receipts and disbursements, analyses of cash flow forecasts, analyses of various asset and liability accounts, and, to the extent applicable, schedules of assets and liabilities and statements of financial affairs, and analyses of potential transactions;

> b.    Analyze the Company's business plan and help develop and provide advice with respect to potential restructuring transactions available to the Company;

> c.    Analyze monthly monitoring reports provided by the Company to effectively evaluate the Company's performance on an ongoing basis;

> d.    Assist and advise the Company in evaluating and analyzing restructuring proposals of the Company;

> e.    Assist the Company and its counsel in the negotiation of any and all aspects of any potential restructuring transaction;

f.      Attend Company meetings as may be required in the role of advisors to the Company;

g.      Review and provide analysis of plans of reorganization and disclosure statements relating to the Company, if applicable;

h.      Assist and advise the Company in reviewing and evaluating any court motions filed or to be filed by the Company or any other parties-in-interest, if applicable;

i.      Provide other services that are consistent with the Company's needs, in keeping with the objectives of the Project; and

j.      Participate in meetings and discussions between the Company, on the one hand, and various stakeholder constituencies and their respective professionals, on the other.

3.      MAEVA's services are limited to those provided in this Agreement.

4.      MAEVA will submit its evaluations and analyses pursuant to this engagement in periodic oral and/or written reports at the Company's request, though written reports will be provided only if appropriate in MAEVA's reasonable judgment. No third party (other than, for the avoidance of doubt, your Board of Directors (the *Board*) or any committee thereof) shall be entitled to rely on any opinion or advice issued by MAEVA to the Company.

5.      In order for us to perform our services hereunder, it will be necessary for our personnel to have reasonable access to certain books, records and reports of the Company, and have discussions with its personnel. We understand that we will have reasonable access to the Company's management, records and other data; limited access may restrict our ability to perform our services as described in this Agreement. Accordingly, you agree that your senior management will cooperate with our personnel, and make available your personnel and any books, records and other sources from which data can be obtained, as we may reasonably request.

6.      The purpose of this Engagement is for MAEVA to serve as a financial and strategic advisor to you. In order to provide the appropriate services to you, you will provide such assistance, cooperation and information as MAEVA reasonably requires. Likewise, we agree to make our personnel reasonably available to you and provide such information and status reports as you reasonably request.

7.      You recognize and confirm that MAEVA: (a) will use and rely on information available from generally recognized public sources in performing services without having independently verified the same; (b) does not assume responsibility for the accuracy or completeness of such public information; and (c) will not make an appraisal of any assets or liabilities of the Company or any of its market competitors.

8.      Our reports will encompass only matters that come to our attention in the course of our work that we perceive to be significant in relation to the objectives of this Engagement.

2

Because of any time and scope limitations implicit in this Engagement and the related limitations on the depth of our analysis and the extent of our verification of information, we may not discover all such matters or perceive their significance. Accordingly, we will not provide assurances in our reports concerning the integrity of the information used in our analyses and on which our findings and advice to you may be based. We are neither being requested to perform an audit nor to apply generally accepted auditing standards or procedures. We are entitled, in general, to rely on the accuracy and validity of the data obtained from generally recognized public sources or supplied to us by your employees and representatives. We will not, nor are we under any obligation to update data submitted to us or review information relating to any topics outside the scope of our engagement hereunder unless you specifically request us to do so.

9.      Our work will be performed on a *level-of-effort* basis that may, under the circumstances of this Engagement on the Project, cause our advice to be limited in certain respects based upon, among other matters, the extent of sufficient and available data and the opportunity for supporting investigations within available time periods. We agree to keep you apprised of any such limitations.

10.     You hereby agree to treat confidentially any proprietary or non-public information received from us in connection with the Project, whether orally or in writing, and, except as provided in this agreement, not to publish, distribute or disclose in any manner any such information (other than to our senior management and the Board) without our prior written approval. Such approval shall not be unreasonably withheld, conditioned or delayed. Our approval shall not be required if (a) the information is required to be disclosed by applicable law, regulation or legal process, the order of a court or administrative agency, or to comply with any lawful discovery rule or requirement, provided, to the extent lawful and practicable, you give us written notice and a reasonable opportunity to obtain confidential treatment thereof, (b) such information is otherwise publicly available through no fault of the Company or its officers, members, managers, employees, contractors, agents, representatives or affiliates (*Related Persons*), or (c) the information is required to be disclosed by you under federal securities laws or regulations; provided however, that you will use reasonable efforts where possible to obtain our reasonable nonbinding comments on prospective public disclosures involving this Engagement. Notwithstanding anything in the foregoing to the contrary, we acknowledge that the existence of this Agreement may be publicly disclosed by you, and that this Agreement may be filed by you with the SEC, which determination shall be made solely by you after consultation with your counsel.

11.     We acknowledge the Confidentiality Agreement, dated April 28, 2016, between MAEVA and the Company (the *Confidentiality Agreement*). We agree to treat confidentially any and all Confidential Information (as defined in the Confidentiality Agreement) received from you or your representatives, in connection with the Project, whether orally or in writing, and, except as provided in the Confidentiality Agreement, not to disclose in any manner any Confidential Information received from you or your representatives in connection with the Project to any party other than our personnel who have a need to know such information in connection with the performance of services under this engagement without your prior written approval, and shall not use any such information for any purpose other than our performance of such services. We and you shall be entitled to enforce the provisions of paragraphs 10 and 11, respectively, by obtaining specific or injunctive relief from a court, without the necessity of

3

posting bond or proving lack of an adequate remedy at law, and without limitation of other remedies that may be available at law or in equity.

12.     If we are subpoenaed as the result of any work performed for you in connection with this Engagement, we will provide you, where practicable and legally permissible, prompt notice of any such request or requirement (written if practical) so that you may seek, at your discretion and sole expense, an appropriate protective order or other assurance to maintain the confidential nature of any information sought by the subpoena. For any claims asserted for a period of two years following the termination or expiration of this Agreement, you will indemnify us for the reasonable actual out-of-pocket expenses incurred in responding to such a subpoena(s) or claim.

13.     The term of this Agreement shall commence on the Effective Date and shall automatically terminate on December 31, 2016 (the *Term*), unless extended by mutual written agreement or unless sooner terminated by you for any reason in your sole discretion upon at least 30 days' prior written notice to us and payment of any unpaid Minimum Retainer Fees and Expenses as described in paragraph 14. For the avoidance of doubt, the expiration date does not supersede or truncate any compensation that may be due as a result of the applicable Tail Period as described in paragraph 14(f).

14.     As sole compensation for the services rendered by MAEVA hereunder, you agree as follows:

a.      You shall pay MAEVA a monthly retainer fee of $175,000 (the *Retainer Fee*) payable by cash, check (payable to "MAEVA Group, LLC"), electronic transfer, or other instrument in immediately available U.S. funds. The Retainer Fee is payable on the second business day following the Effective Date, and on the first business day of each calendar month thereafter during the Term. The initial installment of the Retainer Fee will be prorated to account for the partial month at the commencement of the Term. Notwithstanding the foregoing, in no event shall the aggregate Retainer Fees payable to us hereunder be less than $500,000 (*Minimum Retainer Fee*), notwithstanding any expiration or termination of this Agreement, unless this Agreement is terminated by you as a result of our fraud, gross negligence, willful misconduct or material breach of the Confidentiality Agreement (such event, a *for cause termination*).

b.      You shall reimburse us for all reasonable and actual documented out-of-pocket expenses associated with this engagement, including but not limited to any reasonable legal fees and expenses of our attorneys (*Expenses*). We will provide written documentation to you in the form of receipts or other sufficient evidence to substantiate such Expenses no later than fifteen (15) days following the conclusion of the month in which such Expenses were incurred. We shall seek your pre-approval of any expense of ten thousand dollars ($10,000) or more.

4

c.    You agree to maintain a $25,000 deposit (the *Expense Deposit*) with us from which Expenses shall be deducted during the Term of this Agreement. We will provide a written report no later than fifteen (15) days following the conclusion of each calendar month showing (1) the balance of the Expense Deposit as of the first calendar day of each month (2) an itemization of each expense deducted from the Expense Deposit during such month, and (3) the balance of the Expense Deposit as of the last day of such month. In the event the Expense Deposit balance is less than $25,000 at the conclusion of any calendar month following our deduction of Expenses, You shall replenish the Expense Deposit to an amount not less than $25,000. Any unused Expense Deposit will be returned to you within 60 days after the expiration or termination of this Agreement.

d.    We will receive a separate fee (the *Completion Fee*) of $3,250,000 upon the completion of any transaction or series of related transactions resulting from the Project consummated during the Term (collectively, a *Restructuring*). For purposes of this subsection 14(d), a Restructuring shall be deemed to have successfully occurred if the Company enters into one or more transactions, approved by the Company's Board of Directors, relating to the Project. Such Completion Fee shall be payable at the closing of the Restructuring. Except as set forth in subsection 14(f), in the event that this Agreement terminates or expires without the occurrence of a successful Restructuring, no Completion Fee shall be due.

e.    In addition, we are eligible for an additional fee above and beyond the Completion Fee, based on extraordinary performance (*Discretionary Fee*). Whether a Discretionary Fee is paid at all, and, if so, the amount, is solely subject to the discretion of the Board. We acknowledge that we are not guaranteed a Discretionary Fee.

f.    If we provide material services to Company in connection with a Restructuring that (i) is completed within 6 months following the expiration or termination of this Agreement; or (ii) is the subject of a binding restructuring agreement entered into by the Company within 6 months following the expiration or termination of this Agreement, which thereafter closes within 12 months following the expiration or termination of this Agreement (collectively, the *Tail Period*), then Company shall pay to MAEVA (x) a Completion Fee as if such Restructuring occurred during the Term of this Agreement, and (y) any Discretionary Fee. Notwithstanding the foregoing, the Tail Period and any compensation due to MAEVA under this subsection shall not apply in the event of a for cause termination by Company.

As used in this Agreement, the phrases "termination of this agreement" and "termination of this engagement" are intended to have the same meaning.

5

15.     This Agreement refers to and incorporates the indemnity agreement attached hereto as Schedule A.

16.     Neither MAEVA, the Company nor any of their respective assignees or successors shall (a) seek a jury trial in any lawsuit, proceeding, counterclaim or any other action based upon, or arising out of or in connection with the Company's engagement of MAEVA or any services rendered pursuant to this Engagement, or (b) seek to consolidate any such action with any other action in which a jury trial cannot be or has not been waived. The provisions of this paragraph have been fully discussed by you and us and these provisions shall be subject to no exceptions. Neither the Company nor MAEVA has agreed with or represented that the provisions of this section will not be fully enforced in all instances.

17.     Each of Company and us hereby irrevocably and unconditionally (a) submits itself and its properties in any legal action or proceedings relating to this Agreement for the Engagement or any services rendered pursuant to this Agreement, to the non-exclusive general jurisdiction of the Courts of the State of New York, the Courts of the United States of America for the Southern District of New York, and appellate courts from any thereof; (b) consents that any such action or proceedings may be brought in such courts and waives any objection that it may now or hereafter have the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same; (c) agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; (d) waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this paragraph any special, exemplary or punitive or consequential damages; and (f) additionally the Company agrees that, except for claims that may be covered by one or more of our liability insurance policies, under no circumstances shall we be liable for any claims or damages that exceed the aggregate amount of fees paid by the Company to MAEVA pursuant to this Engagement, in the absence of our or any of our Related Persons' fraud, gross negligence or willful misconduct or a breach by us of the Confidentiality Agreement.

18.     Notwithstanding anything to the contrary contained herein, upon completion and if you make public disclosure of the Project, then we shall have the right to disclose the successful completion of our services on the Project in an advertisement describing our services placed, at our own expense, in financial and other newspapers or otherwise, after review and approval thereof by you, which approval shall not be unreasonably withheld, conditioned or delayed.

19.     You and we acknowledge that each had the opportunity to consult with counsel regarding the terms of this Agreement, and neither party to this Agreement stands in a superior position to the other with respect to the services to be provided hereunder or any transactions contemplated by this Agreement.

20.     If this Agreement expires or if you terminate this Agreement or our Engagement, you will not be responsible for fees that accrue after the date of termination or expiration, other than any remaining Minimum Retainer Fees or any amount accrued and payable pursuant to paragraph 14(b) (unless you terminated as a result of our fraud, gross negligence or willful

6

misconduct, in which case you will not be responsible for any Minimum Retainer Fees or any amount otherwise payable pursuant to paragraph 14(b)) and Expenses related to any requirement to testify at any administrative or judicial proceeding related to this engagement or the Project.

21. This Agreement and Schedule A hereto (a) constitute the entire agreement of the parties with respect to the subject matter hereof and supersede any other communications, understandings or agreements (both written and oral) between the parties with respect to the subject matter hereof, and (b) may be modified, amended or supplemented only by written agreement between both parties hereto. This Agreement does not amend in any way the Confidentiality Agreement, which shall survive the execution and delivery of this Agreement by the parties hereto.

22. This Agreement may be executed in two or more counterparts, including by electronic means, both of which together shall be considered a single instrument.

23. In the performance of our services hereunder, we acknowledge that we are an independent contractor and neither we nor our Related Persons shall be deemed employees of the Company. We acknowledge that we have no authority to enter into any contract on behalf of the Company or otherwise to bind the Company to any obligation and we agree not to hold us out to any person as having any such authority.

24. MAEVA shall make no public statement about this engagement or any Project (except as specifically permitted in this Agreement) without your prior written consent.

25. The Company shall have no obligation to negotiate, pursue or complete the Project or execute any transaction or Restructuring.

26. MAEVA will provide the services in a diligent, trustworthy and businesslike manner and in accordance with all applicable laws and governmental regulations. Without limiting the generality of the foregoing covenant, we agree to provide services pursuant to this engagement in strict compliance with the Foreign Corrupt Practices Act of 1997, as amended from time to time (the *FCPA*), the Bribery Act 2010 (the *Bribery Act*) and any other law, regulation, order, decree or directive of any jurisdiction relevant to the Company having the force of law and relating to bribery, kick-backs, or similar business practices. Specifically, we shall not, and shall procure that any person acting on our behalf with respect to the Project does not (i) offer, promise or give any financial or other advantage to any person with the intention of influencing a person (who need not be the recipient of the advantage) to perform his or her function improperly, or where the acceptance of such advantage would itself be, or might be seen to be, improper; or (ii) offer, promise or give any financial or other advantage to a foreign public official (or to any other person at the request of, or with the acquiescence of, a foreign public official) with the intention of influencing that official in the performance of his or her public functions, in either case with a view to obtaining or retaining business or any form of commercial advantage for the Company or any of its affiliates. For the avoidance of doubt, the prohibitions above apply to the offer, promise or making of any facilitation payments.

7

It is our intention to work closely with you and to discuss our Engagement regularly. This should facilitate our progress and serve to confirm or modify the scope of our Engagement on an ongoing basis.

We look forward to working with you on this matter. Please sign and return a copy of this Agreement signifying your agreement with the terms and provisions herein. If you have any questions, please call Harry Wilson at (914) 219-4660.

Respectfully submitted,

MAEVA Group, LLC

By: _____

Harry J. Wilson
Founder and Chief Executive Officer

Accepted and Agreed

Armstrong Energy, Inc.

By: _Mut D. Wl___

Martin D. Wilson
President and Chief Executive Officer

8

It is our intention to work closely with you and to discuss our Engagement regularly. This should facilitate our progress and serve to confirm or modify the scope of our Engagement on an ongoing basis.

We look forward to working with you on this matter. Please sign and return a copy of this Agreement signifying your agreement with the terms and provisions herein. If you have any questions, please call Harry Wilson at (914) 219-4660.

Respectfully submitted,

MAEVA Group, LLC

By: _____

Harry J. Wilson
Founder and Chief Executive Officer

Accepted and Agreed

Armstrong Energy, Inc.

By: _____

Martin D. Wilson
President and Chief Executive Officer

8

## SCHEDULE A

This Schedule is attached to, and constitutes a material part of, that certain agreement (the *Agreement*) dated as of May ₃ₓ₃  , 2016 between MAEVA Group, LLC (*MAEVA*) and Armstrong Energy, Inc. (the *Company*). Unless otherwise noted, all capitalized terms used herein shall have the meanings set forth in the Agreement.

As a material part of the consideration for the agreement of MAEVA to furnish its services under the Agreement, the Company agrees (i) to indemnify and hold harmless MAEVA and its affiliates, and their respective past, present and future Related Persons, advisors, subcontractors and controlling persons (each an *Indemnified Party*), to the fullest extent lawful, from and against any and all losses, claims, damages or liabilities (or actions in respect thereof), joint or several, (A) arising out of or based upon any untrue statement or alleged untrue statement of any material fact contained in the materials or any other information (whether written or oral) supplied to any third party by or on behalf of the Company or the omission or alleged omission to state therein a material fact required to be stated therein or necessary in order to make the statements therein not misleading, or (B) any actions taken or omitted to be taken by the Company or an Indemnified Party with the consent of the Company in connection with the Agreement, or otherwise arising out of or relating to MAEVA's engagement under the Agreement, and (ii) to reimburse each Indemnified Party for all reasonable, out-of-pocket expenses (including without limitation the reasonable fees and expenses of counsel) as they are incurred in connection with investigating, preparing, pursuing, defending, settling or compromising any action, suit, dispute, inquiry, investigation or proceeding, pending or threatened, brought by or against any person (including without limitation any shareholder or derivative action), arising out of or relating to the Agreement, or such engagement, transaction or actions; provided, however, that the Company shall not be liable for any loss, claim, damage or liability (i) that relates to a dispute solely between or among one or more Indemnified Parties or (ii) which is finally judicially determined by a court of competent jurisdiction to have resulted primarily from the fraud, willful misconduct or gross negligence by or of any Indemnified Party. In the event of such a judicial determination, then MAEVA shall promptly reimburse the Company for any out-of-pocket expenses advanced to MAEVA or any other Indemnified Party pursuant to this paragraph.

The Company may assume the defense of any litigation or proceeding in respect of which an indemnity obligation arises from Company to an Indemnified Party hereunder, including the employment of counsel and experts reasonably satisfactory to MAEVA and the payment of the fees and expenses of such counsel and experts, in which event, except as provided below, the Company shall not be liable for the fees and expenses of any other counsel or expert retained by any Indemnified Party in connection with such litigation or proceeding. In any such litigation or proceeding the defense of which the Company shall have so assumed, any Indemnified Party shall have the right to participate in such litigation or proceeding and to retain its own counsel and experts, but the fees and expenses of such counsel and experts shall be at the expense of such Indemnified Party unless (i) the Company and such Indemnified Party shall have mutually agreed in writing to the retention of such counsel or experts, (ii) the Company shall have failed in a timely manner to assume the defense and employ counsel or experts reasonably satisfactory to MAEVA, in its sole discretion, in such litigation or proceeding, or (iii) the named parties to any such litigation or proceeding (including any impleaded parties) include the Company and such

1

Indemnified Party and representation of the Company and any Indemnified Party by the same counsel or experts would, in the reasonable opinion of MAEVA, be inappropriate due to actual or potential differing interests between the Company and any such Indemnified Party; provided, however, that the Company shall be responsible only for the payment of the reasonable fees and reasonable out-of-pocket expenses of one law firm and one local counsel for all Indemnified Parties. Promptly after receipt by an Indemnified Party of notice of any litigation or proceeding in respect of which indemnity may be sought hereunder, such Indemnified Party shall notify the Company of such litigation or proceeding and the Company shall have 30 days (or such longer period as MAEVA and the Company may agree) to assume the defense thereof.

If for any reason the foregoing indemnification or reimbursement is unavailable to any Indemnified Party or insufficient fully to indemnify any such party or to hold it harmless in respect of any losses, claims, damages, liabilities or expenses referred to in such indemnification or reimbursement provisions (in each case other than as a result of fraud, willful misconduct or gross negligence by or of such Indemnified Party), then the Company shall contribute to the amount paid or payable by the Indemnified Party as a result of such losses, claims, damages, liabilities or expenses in such proportion as is appropriate to reflect the relative benefits received by the Company, on the one hand, and MAEVA, on the other hand, in connection with the matters contemplated by the Agreement. If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law, then the Company shall contribute to such amount paid or payable by any Indemnified Party in such proportion as is appropriate to reflect not only such relative benefits, but also the relative fault of the Company, on the one hand, and such Indemnified Party, on the other hand, in connection therewith, as well as any other relevant equitable considerations. Notwithstanding the foregoing, except as may be covered by one or more of Indemnified Parties' liability insurance policies, in no event shall the Indemnified Parties be required to contribute an aggregate amount in excess of the amount of fees actually received by MAEVA from the Company pursuant to the Agreement. Relative benefits to the Company, on the one hand, and MAEVA, on the other hand, shall be deemed to be in the same proportion as (i) the total value paid or received or contemplated to be paid or received by the Company, and its security holders, creditors, and other affiliates, as the case may be, pursuant to the transaction(s) (whether or not consummated) contemplated by the engagement hereunder, bears to (ii) the fees received by MAEVA under the Agreement. Neither the Company nor MAEVA shall settle, compromise or consent to the entry of any judgment in or otherwise seek to terminate any pending or threatened action, suit, dispute, inquiry, investigation or proceeding in respect of which indemnification may be sought hereunder (whether or not an Indemnified Party is an actual or potential party thereto), unless such settlement, compromise, consent or termination contains a release of the Indemnified Parties reasonably satisfactory in form and substance to MAEVA (or the Company has acknowledged in writing that all liabilities of MAEVA relating thereto will be indemnified by the Company in accordance with this Schedule) or a release of the Company reasonably satisfactory in form and substance to the Company, as the case may be.

The Company further agrees that neither MAEVA nor any other Indemnified Party shall have any liability (whether direct or indirect and regardless of the legal theory advanced) to the Company or any person or entity asserting claims on behalf of or in light of the Company related to or arising out of MAEVA's engagement under the Agreement, any transaction or proposed transaction, or any actions taken or omitted to be taken by an Indemnified Party or the Company

2

in connection with the Agreement, except for losses, claims, damages or liabilities incurred by the Company which are finally judicially determined by a court of competent jurisdiction to have resulted primarily from the fraud, willful misconduct or gross negligence by or of any Indemnified Party. Nothing set forth herein is meant to limit any rights or remedies under the Confidentiality Agreement. The indemnity, reimbursement, and other obligations and agreements of the Company set forth herein (i) shall apply to any services provided by MAEVA in connection with this engagement prior to the date hereof and to any modifications of the Agreement, (ii) shall be in addition to any obligation or liability which the Company may otherwise have to any Indemnified Party, (iii) shall remain operative and in full force and effect regardless of any investigation made by or on behalf of the Company or any Indemnified Party or any person controlling any of them, and (iv) shall survive the completion of the services described in, and any expiration or termination of the relationship established by, the Agreement.

## <u>FIRST AMENDMENT TO THE ADVISORY AGREEMENT</u>

This First Amendment to the Advisory Agreement (this "<u>Amendment</u>") is made and entered into as of October 31, 2017 by and among Armstrong Energy, Inc. (together with certain of its subsidiaries, the "<u>Company</u>") and MAEVA Group, LLC ("<u>MAEVA</u>"). The Company and MAEVA are referred to herein as a "<u>Party</u>" and collectively are referred to herein as the "<u>Parties</u>."

WHEREAS, reference is made to that certain Advisory Agreement, made and entered into as of May 3, 2016 by and between the Parties (as amended, modified and supplemented and in effect from time to time, the "<u>Engagement Letter</u>"); and

WHEREAS, the Parties now desire to amend the Engagement Letter;

NOW THEREFORE, the Parties hereby amend the Engagement Letter as follows:

1.    <u>Definitions</u>. All capitalized terms used, but not otherwise defined, herein, including in the introductory and recital paragraphs above, shall have the meanings assigned thereto in the Engagement Letter. References in the Engagement Letter (including references in the Engagement Letter as amended hereby) to "this Agreement" (and indirect references such as "hereunder", "hereby", "herein", and "hereof") shall be deemed to be references to the Engagement Letter as amended hereby.

2.    <u>Amendment to Engagement Letter</u>. Paragraph 14(d) of the Engagement Letter is hereby amended by deleting such section and replacing such section in its entirety with the following:

"We will receive a separate fee (the *Completion Fee*) of $3,250,000 upon the completion of any transaction or series of transactions resulting from the Project consummated during the Term (collectively, a *Restructuring*). We will provide monthly credits against the Completion Fee, beginning after the first six months of our engagement, at the rate of 50 percent of the Retainer Fee; *provided* that such credits shall not in any circumstances exceed $1,250,000 in the aggregate. For purposes of this subsection 14(d), a Restructuring shall be deemed to have successfully occurred if the Company enters into one or more transactions, approved by the Company's Board of Directors, relating to the Project, so long as such transaction or series of transactions results in at least a substantial portion of the Company's business continuing as a going concern whether through one or more sale transactions or through confirmation of a chapter 11 plan or otherwise, and regardless of whether such transaction or series of transactions is followed by a wind down or liquidation process, and shall not, for the avoidance of doubt, include a wholesale or piecemeal liquidation of the Company's assets in which all or substantially all of the assets are not operated as going concerns. Such Completion Fee shall be payable at the closing of the Restructuring. Except as set forth in subsection 14(f), in the event that this Agreement terminates or expires without the occurrence of a successful Restructuring, no Completion Fee shall be due."

3.      <u>Effectiveness</u>.  This Amendment shall become effective on and as of the first date on which executed counterparts of this Amendment shall have been delivered to each Party hereto, which for the avoidance of doubt, such effective date is October 31, 2017.

4.      <u>Miscellaneous</u>.  The amendment provided in Section 2 hereof shall be applicable solely with respect to those matters expressly provided therein and no other amendments may be construed or implied.  Except as expressly provided herein, the Engagement Letter is and shall remain unchanged and nothing contained in this Amendment shall abrogate, prejudice, diminish or otherwise affect any powers, right, remedies or obligations of any Person arising before the date of this Amendment.

5.      <u>Governing Law</u>.  THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED, ENFORCED AND PERFORMED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

6.      <u>Counterparts</u>.  This Agreement may be signed in one or more counterparts (including by means of facsimile or PDF signature pages), each of which need not contain the signature of all Parties hereto, and all of such counterparts taken together shall constitute a single agreement.

*[Signature pages follow]*

IN WITNESS WHEREOF, the Company has executed this Amendment as of the date and year first set forth above.

ARMSTRONG ENERGY, INC.

By: _____
    Name: J. Hord Armstrong, III
    Title:  Executive Chairman

ACKNOWLEDGED AND AGREED:

MAEVA Group, LLC

By:_____
     Name: Harry J. Wilson
     Title:  President and Chief Executive Officer